IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:20-CR-261 |
| v. | Hon. Leonie M. Brinkema |
| SAAD JALAL, | Sentencing: November 9, 2021 |
| *Defendant*. | |

## GOVERNMENT'S POSITION ON SENTENCING

The defendant, Saad Jalal, comes before the Court for sentencing after pleading guilty to one count of distribution of methylenedioxyamphetamine ("MDA"), a Schedule I controlled substance, in violation of Title 21 U.S.C. § 841(a)(1).

The United States has no objection to the Probation Officer's calculations of the defendant's Sentencing Guidelines, as set forth in the Presentence Investigation Report ("PSR") (ECF No. 33) in Part D. Further, the United States agrees that the defendant has accepted responsibility and assisted authorities in the prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby allowing the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The Probation Officer has already accounted for the defendant's acceptance of responsibility. PSR ¶ 54.

The distribution to which the defendant pleaded guilty resulted in the overdose of a young woman from Fairfax County. Because the defendant's guidelines do not account for that fact, and for the reasons set forth herein, the United States respectfully recommends that the Court depart upward and impose a sentence of 24 months' imprisonment.

**BACKGROUND**

On September 21, 2019, the Fairfax County Police Department ("FCPD") responded to a 911 call regarding a suspected drug overdose at a residence in Falls Church, Virginia. The Victim, a 21-year-old woman, had been partying with her two roommates—referred to in court filings as Individuals 1 and 2—along with the defendant, and had consumed what all parties believed to be MDMA, sometimes called "molly." As forensic analysis showed later, the substance was actually MDA, another designer drug similar in chemical structure to MDMA.

As it turned out, the defendant had obtained the MDA earlier in the day through a connection he had in Baltimore—a connection he met when he was undergoing a clinical rotation as part of his medical studies. That evening, the defendant went to the three women's home, where Individual 1 and Individual 2 were waiting. The defendant distributed the MDA to Individual 1 and Individual 2, who divided the drug into smaller quantities, including a portion for the Victim, who was not present.

The defendant, Individual 1, and Individual 2 then drove into the District of Columbia to pick up the Victim from her workplace at the end of her shift. Then, the Victim and her two roommates each consumed a quantity of the MDA.

The Victim became noticeably impaired, and because of her impairment, the group was denied entry at certain bars in D.C. and decided to return home to Falls Church. Shortly after arriving, the Victim collapsed into the fetal position, writhing on the ground. The defendant, who was a medical student at the time, began performing CPR on the victim.

When the FCPD detectives arrived, one of the Victim's roommates was so high from the MDA, that she was unable to provide any coherent information. When the detectives interviewed

2

the defendant, he initially denied providing narcotics to the Victim. When they confronted him with information provided by the other, less impaired roommate, the defendant admitted to obtaining the MDA from Baltimore and transporting it to the Victim's residence. The defendant then provided the FCPD detectives with the remaining MDA from a small baggie in his wallet.

The Victim ultimately suffered a fatal overdose that resulted from her consumption of the MDA that the defendant provided. The Virginia Office of the Chief Medical Examiner ruled that the cause of the Victim's death was acute MDA intoxication. A forensic toxicologist from the Virginia Department of Forensic Science analyzed samples of the Victim's blood and found that the only controlled substance present in her blood was MDA. The narcotics obtained from the defendant's wallet were tested and confirmed to be MDA.

On November 18, 2020, a grand jury sitting in the Eastern District of Virginia returned a single-count indictment charging the defendant with Distribution of MDA, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). The defendant was arrested on April 6, 2021, at the U.S.-Canadian border at Buffalo, New York. He was ordered transferred in U.S. Marshals Service custody to the Eastern District of Virginia.

The defendant made his initial appearance in this District on April 27, 2021, and on May 7, 2021, the defendant was released on a $10,000 secured bond. In total, the defendant served 32 days in federal custody. On July 2, 2021, the defendant came before the Court and pleaded guilty to the sole count of the indictment, and the Court continued the defendant's bond.

## SENTENCING ANALYSIS

**I.**     **Law on Sentencing**

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence. Although the Sentencing Guidelines

are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. 18 U.S.C. § 3553(a).

## II. Guidelines Calculation

The base offense level based on drug quantity is 8, as stipulated in the defendant's plea agreement. PSR ¶¶ 6, 47. The government agrees with the Probation Officer's application of the two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). PSR ¶ 54. There are

no other enhancements or reductions to the offense level; an offense level of 6 and criminal history category I yields an advisory Guidelines range of 0–6 months imprisonment. PSR ¶¶ 92–93.

The calculated offense level, however, is based purely on the defendant's drug weight, and does not distinguish him at all from any other individual who dealt in a certain quantity of drugs. It does not account for the fact of the Victim's death, which the defendant has admitted to causing. PSR ¶ 37. Accordingly, the government hereby moves the Court to impose an upward departure pursuant to U.S.S.G. § 5K2.1. This section provides:

> If death resulted, the court may increase the sentence above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. *The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury.* For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

(emphasis added). The government's arguments with respect to the factors listed in this provision largely overlap with the government's argument regarding the § 3553(a) factors; accordingly, the government will address both issues in the following section.

### III.  Sentencing Analysis

It is true that the defendant is not a drug dealer in the conventional sense. He did not sell drugs for money, and he was not a regular drug user. PSR ¶¶ 76–77. In this case, he obtained a relatively small quantity of drugs for his friends to use. His low offense level based on the small

5

quantity of MDA at issue reflects these circumstances. But, what the defendant's guidelines do not adequately reflect are the aggravating circumstances of this offense.

First, the distribution resulted in a young woman's entirely preventable death. The letter from the Victim's father and the family photos make clear that she was a bright young woman, beloved by her family, with a promising future. Having presided over numerous drug-overdose cases, the Court is amply familiar with the devastation wrought on the families of drug overdose victims.

Second, the defendant was training to be a doctor when this tragedy occurred. With his educational background, the simple fact is that the defendant should have known better. As part of his medical training, he should have been familiar with the different schedules of controlled substances, as well as the potential dangers associated with psychedelic drugs like MDA and MDMA. These two substances are from the same family of drugs, differing only slightly in chemical structure. According to Drug and Alcohol Research and Training Australia, "MDA has been linked to some deaths, usually from seizures, hyperthermia or heart problems, possibly due to the stimulant effect of the drug."[1]

Even if the defendant believed that the drug was MDMA, rather than MDA, the potential complications with "molly" are well-documented.[2] Such complications include hyperthermia, disseminated intravascular coagulation (abnormal blood clotting), rhabdomyolysis (muscle tissue

---

[1] Paul Dillon, *What is the difference between MDMA and MDA?*, The Real Deal on Drugs blog, available at http://realdealondrugs.blogspot.com/2014/10/what-is-difference-between-mdma-and-mda.html (last accessed Nov. 2, 2021).

[2] S Ramcharan et al. (1998) *Survival After Massive Ecstasy Overdose*, Journal of Toxicology: Clinical Toxicology, 36:7, 727-731, DOI: 10.3109/15563659809162623, *available at* https://pubmed.ncbi.nlm.nih.gov/9865243/.

6

deteriorates and releases proteins into the blood) and kidney failure. *Id.* In 2013, a 19-year-old woman died of an overdose of MDMA at a nightclub in D.C., on the same day two others died from an MDMA overdose at a music festival in New York.[3] In short, MDMA is every bit as dangerous as the structurally similar MDA, and the defendant should have known that and thought twice before engaging in this conduct that has wrought so much pain on the Victim, her family, and the defendant and his family in this case.

The nature of the defendant's offense, the need for general deterrence of crimes of this nature, and the need to provide just punishment for this offense are all reasons why the Court should depart upward from the Guidelines, pursuant to U.S.S.G. § 5K2.1, and impose a period of incarceration of 24 months.

## CONCLUSION

For the reasons stated herein, the United States respectfully submits that a sentence of 24 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Katherine E. Rumbaugh
Assistant United States Attorney

---

[3] Caulfield, P., *Brilliant University of Virginia student dies from 'molly' overdose at D.C. club*, New York Daily News, available at https://www.nydailynews.com/news/national/uva-scholar-dies-molly-overdose-article-1.1448597 (last accessed Nov. 2, 2021).

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2021, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the United States Probation Officer assigned to the case.

                                          /s/
                              Katherine E. Rumbaugh
                              Assistant United States Attorney
                              Eastern District of Virginia
                              2100 Jamieson Avenue
                              Alexandria, Virginia 22314
                              Tel: (703) 299-3700
                              Fax: (703) 299-3982
                              Katherine.Rumbaugh@usdoj.gov