**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Docket No.: 1:20CR00261-001** |
| ) | |
| **SAAD JALAL,** ) | |
|     **Defendant.** ) | |

## DEFENDANT'S POSITION ON SENTENCING

Pursuant to Title 18 U.S.C. § 3553 (a), Federal Rule of Criminal Procedure 32, and Section 6A1.3 of the United States Sentencing Guidelines, the Defendant, SAAD JALAL ("Mr. Jalal"), by and through his attorney, Jeffrey F. Mangeno, states that he has received and reviewed the Pre-Sentence Report ("PSR") prepared in this case.

On October 26, 2021, Mr. Jalal pled guilty to one count of Distribution of Methylenedioxyamphetamine ("MDA"), in violation of 21 U.S.C. §841(a) (1). Given his background, lack of criminal history, and early acceptance of responsibility, a sentence of supervised release is sufficient, but not greater than necessary, to comply with the purposes enunciated by Congress in 18 U.S.C. §3553 (a) (2).

## BACKGROUND

Mr. Jalal was born in Pakistan to Hamid Jalal and Aliya Naeem, on November 19, 1992. While Mr. Jalal spent nearly ten years in Pakistan, he reports not remembering much about his life there. What Mr. Jalal does recall comes to him in flashes: birthday parties where scores of people were in attendance, hiking with his parents and sister in the mountains, his mother smiling broadly at a third grade awards ceremony when administrators called his name eight times. It was his

family's subsequent immigration to Canada, however, that proved to be the defining moment of Mr. Jalal's childhood.

Mr. Jalal came from a happy home that was filled with the love and support of his mother and father. But he confronted a myriad of cultural and personal changes when the family moved to North America. His parents, once celebrated veterinarians in Pakistan, took on new careers—his father, as a supply chain manager for Stalco Sales, and his mother, as a microbiologist at Juravinski Hospital in Ontario. Mr. Jalal, two years younger than his sister, Johana, and ten years older than his brother, Imaad, found himself trying to navigate his new world alone. Everything about Canada was foreign to him—the climate, the people, the dominant religion. Mr. Jalal recalls feeling particularly isolated on account of his noticeably thick accent. "I would stand for hours in front of the mirror in my room, repeating words over and over again, trying to eliminate any trace of it," Jalal says of those early days. Within three years, the accent was gone, but so was Mr. Jalal's desire to assimilate into the fabric of Canada. He remembers this introduction into his formative years as an "awakening" of sorts. This time was characterized by Jalal's compulsion to study every faith he could find and compare to his own. He visited churches of every denomination, temples, and other mosques, all in search of some universal truth he hoped would put him more at ease with who he was in a still-strange land. "It sounds weird, I know, but even then, even at thirteen, I suddenly seemed to have this understanding of the human condition. It's like I suddenly realized we were all just people, all made up of the same things, all beings sharing this life. The stories I heard from church to church—they were all the same after you stripped away the other stuff. Once I saw that, I understood who I really was. It made it easier to stop trying to be someone else."

Mr. Jalal was comfortably in his own skin and attending high school in Ontario when he took a Biology class that would change the course of his whole life. He remembers learning about

cell function and having his mind blown at the prospect of the body collective broken down into the same component parts. He knew, with his penchant for math and the more mechanized science disciplines, that he could have a career in physics or engineering. But Mr. Jalal couldn't picture himself in a field devoid of human interaction. His attraction wasn't necessarily to the science itself, but to how it explained what made people who they were. At fifteen, Jalal realized that what he wanted more than anything was to use his knowledge to help people; to do so, he would have to become a doctor.

The rest of high school was a blur of activity and schoolwork. Jalal took every math and science course he could, excelling in all, but also balanced his academic pursuits with community service and extracurricular activities. Jalal was a member of the student government. He acted in school plays and sang in the choir. He arranged drives every year, convincing children to go door to door soliciting canned goods for local shelters at Halloween. He conquered his fear of water and learned to swim, ultimately becoming both a lifeguard and instructor. When Mr. Jalal graduated in 2010, he felt prepared to face the world. He embarked on a course of study that would end in the actualization of his greatest dream—practicing medicine.

Collegiate life was everything Mr. Jalal hoped it would be. The confluence of people from every culture volleying ideas of every origin excited him. He busied himself with learning as much as he could academically, while studying the interactions and relationships of people organically. And he was, by all accounts, successful. After graduating with a Bachelor of Neuroscience from the University of Toronto in 2014, Mr. Jalal began attending Saba University School of Medicine in 2015.

Jalal wasn't long into his medical studies before he started recognizing cycles of behavior in both patients and treating physicians. Mr. Jalal noticed that most if not all of what he was

learning focused on healing people once they had *already* become ill. And while there were of course modules and classes that touched on preventative health, his instructors didn't spend much time teaching the relationship-building that enabled those conversations to happen with patients. He immediately turned his attentions to integrated healthcare. Here, Jalal was able to marry the science of medicine with a person's mental outlook or physical activity. He was able to examine the effects of emotion and stress on the body's immune and digestive systems. The idea of integrated healthcare allowed Jalal to see people exactly how they presented—as multidimensional, complex beings—rather than sick bodies to be treated and sent home. He was thinking more globally; Jalal wanted to keep people from becoming sick at all.

     Mr. Jalal remained at Saba University for two years before beginning his clinical rotations. These cycles would enable him to travel all over the United States learning various skills at institutions throughout the country. Jalal spent time in Kansas City, Kansas, Shreveport, Louisiana, San Jose, California, and Norman, Oklahoma. The constant pace of travel seemed like an endless run of packing and unpacking, adjusting and acclimating, only for Jalal to be uprooted and relocated again and again. And while he knew that this was simply the nature of his studies, it didn't make the reality of his nomadic lifestyle or its attendant loneliness any more bearable. Mr. Jalal had all but given up hope of finding any new friends by the time he reached his rotation at a psychiatric institute in Washington, D.C., but a chance encounter in the Adams Morgan area of the city in September of 2019 changed his perspective, and ultimately his life, forever. Washington, D.C. proved to be the last rotation Mr. Jalal would do, and the start of the troubles that bring him before this Court at present.

**ARGUMENT**

I.  **Legal Standard**

Since the Guidelines were held to be only advisory in *United States v. Booker*[1], imposing a sentence is no longer a simple mathematical exercise. And while "[A] district Court shall first calculate (after making the appropriate findings of fact) the range prescribed by the Guidelines,"[2] they must now make "an individualized assessment based on the facts presented after calculating the advisory Guidelines range."[3] Even then, the range is but one of several factors a Court must consider when imposing a sentence, and it is legal error to treat those ranges as default sentences.[4] A Court must also weigh the factors enumerated in 18 U.S.C. § 3553 (a) when imposing a sentence.

Giving consideration to all of the 18 U.S.C. § 3553 (a) factors, a district judge must "impose a sentence sufficient, but 'not greater than necessary' to accomplish the goals of sentencing."[5] Courts need not point to "'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall v. United States* 552 U.S. 38, 47. A below-Guidelines sentence may be appropriate if the district Court determines that "the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the case warrants a different sentence regardless."[6] After calculating the total offense level and providing "both parties an opportunity to argue for whatever sentence they deem appropriate, the

---

[1] *United States v. Booker*, 543 U.S. 220,226 (2005)
[2] *United States v. Hughes*, 401 F. 3d 540,546 (4th Cir. 2005)
[3] *Gall v. United States*, 552 U.S. 38, 50 (2007)
[4] *United States v. Mendoza-Mendoza*, 597 F. 3d 212,216-17 (4th Cir. 2010); Nelson v. United States, 555 U.S. 350, 352 (2009) (per curiam)
[5] Kimbrough v. United States, 552 U.S. 85, 101 (2007) quoting 18 U.S.C. § 3553 (a).
[6] *Rita v. United States*, 551 U.S. 338,351 (2007).

district judge should then consider all of the 18 U.S.C. § 3553 (a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50.

The factors for the district Court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kind of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence: to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to the defendant and others; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553 (a). A district Court must weigh each of these factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to 18 U.S.C. § 3553 (a). *Id.*

## II. A Sentence of Supervised Release is Sufficient But Not Greater Than Necessary To Achieve the Goals of Sentencing Under 18 U.S.C. § 3553 (a)

### i. Nature and Circumstance of the Offense

It is difficult to overstate the magnitude of the tragedies surrounding the instant offense. It is clear, however, that a confluence of factors led to both the decisions Mr. Jalal made on the night of September 20th, 2019, and the death of Alexandra Maller that occurred as a result. And while Mr. Jalal accepts full responsibility for his role in these events, it is important to note how unlikely such a horrific outcome seemed at the start of the evening.

Mr. Jalal had met Maller and her roommates, Victoria Owens and Salma Wahba, approximately three weeks prior while walking around Adams Morgan in Washington, D.C. Jalal was doing a neuropsychiatric rotation in the city and had spent a great deal of time

6

travelling the country at other rotations at various clinics. He had grown lonely over the years, moving from program to program, never staying in one particular place too long, so he was excited at the prospect of making several new friends. While the newly-minted circle only had occasion to share company over the course of three weeks, Mr. Jalal says the quartet spent many of those days together. Sometimes they combed the city at night in search of entertainment; other times they stayed in and watched movies at the women's home in Falls Church, Virginia.

The group's lively discussion topics ran the gamut from music preferences to their varied goals and dreams. But on multiple occasions, they spoke of their shared interest in certain illicit drugs. Mr. Jalal's vantage point was shaped by a hybrid of his medical studies as well as a few of his own personal experiences. He shared research findings about the effects of acid and other hallucinogens on the moods and interactions in certain group settings. For his part, Jalal had taken MDMA on a couple of occasions during medical school as a means to alleviate social anxiety and feel closer to his peers. But for an occasional use of marijuana, he considered himself something of a novice in the world of recreational drugs.

His new friends, however, seemed more knowledgeable with respect to these matters. They all had stories about good experiences with MDMA (known colloquially as "Molly") and were anxious to try again. Mr. Jalal too became excited by the prospect of an altered, less inhibited state of consciousness where he could feel closer to this new group. And the four of them determined to put out individual "feelers" in the hopes that a connection would appear.

Not long after, Mr. Jalal was talking about the plan to an old acquaintance who had a dealer friend in Baltimore. Mr. Jalal felt that the source was trustworthy because of his affiliation with his old friend; this feeling was affirmed when he travelled to Baltimore and met the man at his home. Mr. Jalal remembers thinking the man was straightforward and friendly, and that the

environment was clean and the atmosphere, light. He procured approximately three grams of what he thought to be MDMA in rock form, and then contacted the women to apprise them of his success.

The four of them made plans to meet, and Mr. Jalal took the presumed Molly to the residence in Falls Church. Mr. Jalal remembers sitting down at a table with Victoria and Salma and placing the rock down on the table. He says that Victoria found a scale so that the trio could evenly distribute their individual shares, setting aside a portion for their friend, Alex, who was at work at the time. Jalal remembers feeling anxious as Victoria prepared to take more than what he thought was necessary. The women laughed him off, assuring him that they knew what they were doing, and had taken these amounts before. Mr. Jalal, himself, had only taken a small portion of the drug, but instantly felt its effects, giving weight to his belief in its potency. He again cautioned the women about taking too much, and they compromised and agreed to dose throughout the evening.

The group was anxious to be out, and Salma drove them to Morton's Steakhouse in Washington, D.C. to pick up Alex for what they thought would be a fantastic night on the town. When Alex met them at the car, they all began to take their portions of the drug. Mr. Jalal doesn't remember how much Alex took, but recalls again cautioning the women against overuse. They travelled around D.C., looking for clubs to get into, venturing from place to place on foot. At some point, Jalal took note of how intoxicated Alex seemed. The women assured him that her behavior was no different than it always was on Molly, so they continued looking for bars. As time progressed, however, Alex appeared more and more intoxicated. She was unsteady on her feet and slurring her words. Many of the doormen at the establishments they went to denied them

entry on account of how Alex was presenting. Mr. Jalal was growing more concerned, and suggested the women head home for a movie night in.

When the group arrived back in Falls Church, Alex seemed thoroughly drunk, but was communicating more clearly. Mr. Jalal felt a sense of relief that they had successfully made it home without incident, and Alex appeared to be coming around to her normal self. Moments later, however, her gait was unsteady once more. Her body began to jerk wildly as she agitatedly scratched at her own face. Shortly thereafter, Alex collapsed to the floor in what Mr. Jalal quickly recognized as a seizure. He shouted to Salma to call 9-1-1, and stayed by Alex's side, monitoring her symptoms. When the seizure subsided, Mr. Jalal noted that he couldn't find a pulse rate. He immediately began CPR as he called out to Salma, once more, to call 9-1-1. Mr. Jalal continued performing CPR on Alexandra Maller until the paramedics came to take her away. When they called several hours later to update the remaining friends on what had transpired, they told them Alex had died of an MDA overdose. The drug Mr. Jalal had procured wasn't even the MDMA the group had planned their evening around. It was a significantly more potent, and ultimately deadly substance. Now one in their number was gone.

Mr. Jalal was devastated. He was rocked to his core. His new friend was gone and he'd purchased the drugs that had been instrumental in her death. He'd spent years devoting his life to the preservation of human life, and in one, lone night he'd undone all of it—and now Alex was dead.

Every part of the night of September 20th, 2019, and the morning of September 21st, 2019 was a tragedy. It was a tragedy that Mr. Jalal felt compelled to impress his new friends by procuring drugs; it was a tragedy that he didn't take a firmer stance in limiting their use. It was a tragedy that this group of young people, with their entire lives ahead of them, felt the best way to

enjoy their night was through the lens of acute drug intoxication. But most of all, it is a terrible, heartbreaking tragedy that Alex Maller lost her life—that her parents lost a daughter—that Salma and Victoria lost their friend. Mr. Jalal, himself, is forever changed, haunted by the memory of that night and the devastating impact one series of poor choices had on his life, and the lives of everyone around him. He has been overwhelmed by depression, and at times even suicidal, since that fateful morning, and thinks about Alexandra's life—lost—every single day.

## ii. History and Characteristics of the Defendant

Literal scores of people have written letters of support for Mr. Jalal, in the hopes that they might convince this Court of the true character of the man they've come to know. While all of these friends and family members have crossed paths with Jalal at varying points throughout the years, each one offers resounding praise for his intellect, his passion for life, and his love of people. Shaizah Khan writes:

> "Saad truly exudes so much passion for life itself and for the betterment of humanity as a whole. He devotes every passing second to better himself merely so he can serve others to his full capacity. I am extremely grateful for the opportunity of writing this letter and being able to offer some insight into who he really is. I sincerely ask that he is given the chance to attain his goals and reach his true potential so he can continue to leave a lasting impact on more people in this world, for that is what makes him an outstanding and exceptional human being." *Defendant's Exhibit 1, Letter from Shaizah Khan.*

Rimi Albatarni says:

> "Ever since I've known Saad, his greatest passion in life has always been to help others, to enrich their lives, and make them easier in any way he possibly could, without ever

expecting anything in return. He's built his entire life and has honed every part of himself around his passion and his care for others. Saad was there for me at a vulnerable time in my life, as I was going through a lot of changes and uncertainties. He supported me through every step of the way, and encouraged me to continuously do better and to always believe in myself. He's taught me so much about what it takes to truly be a good person, and that's just the kind of person Saad is. It's hard to imagine a time where he won't be around to positively impact the world and influence others. And most of all, it's hard to imagine a person like Saad, as selfless and as good-hearted, not being able to achieve his dream of becoming a doctor." *Defendant's Exhibit 1, Letter from Rimi Albatarni.*

Lucas Chamberlain writes:

"I don't know many people better than Saad. Help too often comes at a price. It is rare to meet someone that genuinely wants to help others, and rarer still to find a person that will continue to selflessly reach out without an expectation of return. Saad does both. I consider it a gift to know someone with his capacity for giving, and I believe I am just one voice in a chorus of many, many others that would echo that sentiment." *Defendant's Exhibit 1, Letter from Lucas Chamberlain.*

Samantha Preddie writes:

"[Saad has] poured his heart and soul into making a success of himself. It was critical to him that he be a strong figure for his family and his partner. I can honestly say he possesses a rare form of determination; the kind that makes a lasting impact. Medical school takes a huge emotional toll, but he was always excited at the prospect of helping people. His empathy, curiosity about human nature, and excitement for the sciences made him a natural fit for the field." *Defendant's Exhibit 1, Letter from Samantha Preddie.*

Carolyn Smith says:

> " Saad's academic achievements and intellect are very apparent to everyone. I vouch that he is equally, if not more so, emotionally intelligent and sensitive. He is one of the most pensive people that I know, and he has a large capacity for guilt and remorse. Saad has not only made it his life's mission to help individual people, but he also wants to affect [sic] real change in the world. I remember sitting in our mutual friend's backyard watching a bonfire and contemplating life. We talked about how one person can help as many people as possible; what the best way would be. I think this is Saad's biggest riddle. I vehemently believe that the world is better with Saad free and able to help others, not only medically, but emotionally and with his scrupulous perspective. He knows in his bones what is right, and steps in with leadership when he knows it to be necessary. He has made a horrific mistake, but it is my strong belief that if granted the opportunity, he will use this experience for betterment. He would answer his greatest riddle, and hep more people than I would have believed one person could." *Defendant's Exhibit 1, Letter from Carolyn Smith.*

There are tens of letters, just like the aforementioned. Each one is a testament to Mr. Jalal's intellect, to his kindness, to his empathy, and to his love of people. Before the night of September 19th, 2021, Mr. Jalal was just a doctor trying to make his way in the world. He was in search of friends, and positive experiences, but one poor choice altered the trajectory of his future forever. Mr. Jalal regrets the death of Alex Maller more than anything in this world. He agonizes over the fact that she lost her life after one night of carelessness that he took part in. He thinks constantly of her parents, of her friends, of what her life might have been, and is filled with the pain of remorse.

### iii. Sentencing Guidelines, Just Punishment, Deterrence

While the Court must consider the gravity of the circumstances in the instant offense, it is imperative that it appropriately contextualize the events of September 19th and 20th. It is beyond awful that Alex Maller lost her life; absolutely everything that happened was a tragedy of the highest order. But this was an *accident*. Alex's death was an *accident*. And while Mr. Jalal stands charged under 21 § U.S.C. 841(a)(1), it remains important to note that he is not, in fact, a *drug dealer*. Mr. Jalal doesn't make a habit out of procuring drugs and doling them out to the masses for pecuniary gain. He is not even a reliable drug connection or a drug runner. He is a professional person. And he made a mistake. He himself partook of the MDA (that the group believed to be MDMA) on that fateful night. And when things took a turn for the worse, he did everything he could to save Alex Maller's life, performing CPR on her from the time he noticed her faint pulse, until the paramedics arrived. Those weren't the actions of some heartless, callous dealer; those were the actions of a friend who'd made a mistake—a friend who was desperate to save the life of a person he'd grown to care about.

The Sentencing Guidelines have returned a recommendation of 0 to 6 months of incarceration. They have taken into consideration who Mr. Jalal was before that horrible night—a doctor, a son, a cherished friend, a good brother, and a man with no criminal history in this country or anywhere else. Similarly, this Court should consider who Mr. Jalal has been since that night—a man whose entire life has fallen apart as a direct result. He is trying to move forward, but can only do as much as his grief allows.  He often finds that no matter where he is, no matter how he occupies himself, whether at home or at work, his thoughts return to Alex and the magnitude of what he's done.

      A period of incarceration for a person like Mr. Jalal, who is already enduring a depressive episode as a result of these circumstances, who has already lost everything he loves, and whose life is forever altered would serve no purpose. Mr. Jalal's lifelong dream has been to become a doctor. He has poured everything he has—time, money, resources—into his pursuit of practicing medicine, but that is gone now. He is no longer in a medical program. He isn't affiliated with any clinical rotations. Everything he has worked for up to this point has been permanently derailed. He must confront the world realizing that the one thing he's spent his life training for is the one thing he will never do. What's more, Mr. Jalal will be deported. Every avenue that he has availed himself of in the American health sciences is now closed. He will never complete another clinical cycle here. He will never work here.

      The consequences Mr. Jalal is suffering aren't comparable to what the Mallers have lost—nowhere near. They *are* consequences, however, and they are tremendous. He made a mistake that helped cost Alex Maller her life, but the resulting tragedy itself does not change the fact that it was an *accident*. He took the *same* drugs as Alex Maller. His *other* friends took the *same* drugs as Alex Maller. Only Maller died—because this was an *accident*. And this Court should not be in the habit of jailing people for tragic accidents. Mr. Jalal isn't a criminal in need of reformation; he is a man in need of grace. He has dedicated his *entire* adult life to the care and treatment of the sick. He has walked this Earth in active pursuit of ways to make it better. He doesn't need to rehabilitate his character—this court has approximately forty letters testifying to its goodness; Mr. Jalal needs an opportunity to somehow make amends for this tragic loss of life. Going to prison, however, will not bring Alex Maller back; if it could, Mr. Jalal would surely trade the remainder of his free days on Earth. It will, however, deny him a chance to use his life for some good, when these events have cost him so much already.

Mr. Jalal's friend, Mariolya Maksymiw, has offered some poignant thoughts on Alex Maller's unfortunate death, and what remains of Jalal's last opportunity for great purpose. She writes:

"The death of the young woman has undoubtedly caused immense pain and suffering to her friends, family, and loved ones. I cannot fathom the depths of their pain and the peaks of their sorrows, and I am in no way trying to make light of the situation. I am truly sorry for their loss. In the moments Saad has spoken about this, you can so clearly see, hear, and feel the vast sense of remorse that fills his entire existence. Saad has not been the same person since and rightfully so; to carry such a horrific memory with you throughout the rest of your life is traumatic to say the least. There is nothing one can do short of turning back time. With this being said, Saad has spoken a lot about his hopes and dreams for the future. I know in his heart all he wants to do. All that he has worked so hard for is to be of service to others; to practice compassion and dedicated his life to relieving the suffering of others through medicine… . A life, the most precious gift, was lost and there is no way to bring it back. How is atonement possible? Despite living through this horror, Saad has held on to the light and has made it a point that he will not let her life be in vain, which is why he shared that he wishes to dedicate his life's work in memoriam. I think this is an honourable decision and I know that he will prove to be an outstanding doctor and member of the community at large, leaving a positive impact on people's lives." *Defendant's Exhibit 1, Letter from Mariolya Maksymiw*.

### III. The Immediate Offense Does Not Present A Circumstance Where An Upward Departure From The Guidelines Is Appropriate

The Government takes the position that Mr. Jalal's actions warrant an upward departure from the Sentencing Guidelines, a suggestion that is clearly at odds with its initial assessment of these circumstances at time of Indictment. The Government begins by citing United States Sentencing Guidelines § 5K2.1 which holds, in pertinent part: "*Loss of life does not automatically suggest a sentence at or near the statutory maximum*. The sentencing judge must give consideration to matters…such as the defendant's state of mind…" (emphasis added). The Government chose *not* to indict Mr. Jalal with charges that more readily allowed for enhancement. This suggests that it *also* believed his state of mind at the time of this tragedy did not necessitate incarceration. The Government had every opportunity to indict Mr. Jalal with charges that carried greater weight and the likelihood of significant jail time. It did not. The only conclusion that follows is that the Government recognized that however grave the instant circumstances are, they are the result of an *accident*. Neither this Court nor the Government should be about the business of jailing people for their role in tragic accidents. The Guidelines clearly create an alternative for situations such as these, and Mr. Jalal deserves such an alternative.

In sum, based on Mr. Jalal's background, his acceptance of responsibility, and his commitment to using his life for the greater good, a sentence of supervised release is appropriate in this case. Such a sentence would be sufficient, but not greater than necessary to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553 (a) (2).

## CONCLUSION

WHEREFORE, for the reasons stated above, the Defendant, SAAD JALAL, respectfully asks this Court to forego incarceration and sentence him to a period of supervised release.

Respectfully Submitted,

SAAD JALAL,
By counsel

PATRICK ANDERSON & ASSOCIATES, P.C.

_____/s/_____
Jeffrey F. Mangeno, Esquire
333 N. Fairfax Street Ste. 310
Alexandria, Virginia 22314
Virginia State Bar No.
P: 703-519-7100
F: 703-519-7104
jmangeno@pnalaw.com
Counsel for Defendant
VSB No. 44934

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of November, 2021, I electronically filed the foregoing Memorandum in Support of Sentencing with the Clerk of the court using the ECF system, which will send a notification of such filing (NEF) to the following:

Katherine Rumbaugh
2100 Jamieson Avenue
Alexandria, Virginia 22314
703-299-3700
katherine.rumbaugh@usdoj.gov

                                                 PATRICK ANDERSON & ASSOCIATES, P.C.

                                          _____/s/_____
                                          Jeffrey F. Mangeno, Esquire
                                          333 N. Fairfax Street Ste. 310
                                          Alexandria, Virginia 22314
                                          Virginia State Bar No.
                                          P: 703-519-7100
                                          F: 703-519-7104
                                          jmangeno@pnalaw.com
                                          Counsel for Defendant
                                          VSB No. 44934